Unified Judicial System

 

 
  MAXINE B. CASE,
Plaintiff and Appellant,
v.
JEAN McCOLLOCH
and Judith Sides,
Defendants and Appellees.
Jean McColloch,
Counterclaimant, Crossclaimant, and Appellee,
and Sandra McCroden, Craig Murdock, and Nancy Murdock,
Intervening Claimants and Appellees,
v.
Maxine B. Case,
Defendant and Appellant,
and Judith Sides and Gary Case,
Defendants.
South Dakota Supreme Court
Appeal from the Seventh Judicial Circuit, Pennington County, SD
Hon. John E. Fitzgerald Jr., Judge
#20401, #20420--Reversed in part; Affirmed in part
John J. Delaney, Delaney & Sumner, Rapid City, SD
Attorneys for Appellant.
Rebecca A. Porter, Rapid City, SD
Attorney for Appellant.
Thomas E. Brady, Spearfish, SD
Attorney for Appellees.
Considered on Briefs Oct 19, 1998; Opinion Filed Dec 9, 1998
SABERS, Justice.
[Â¶1] This is a consolidated appeal. The parties are shareholders in Hickok's, Inc., a closely-held corporation. Maxine Case filed a complaint alleging Jean McColloch entered into a loan agreement with Judith Sides which was actually a disguised purchase of Sides' shares of stock in Hickok's, Inc. (shares) in violation of the corporation's articles of incorporation. McColloch counterclaimed that Maxine Case, Gary Case, and Sides breached an agreement to sell their shares to McColloch. Sandra McCroden, Craig Murdock and Nancy Murdock intervened as plaintiffs. The trial court found that 1) the stock transaction was a loan, not a disguised sale and 2) the parties had not entered into an agreement to sell their shares. We reverse 1) and affirm 2).
FACTS 
[Â¶2] Hickok's, Inc. is a closely-held corporation formed in 1989 to own and operate a casino in Deadwood, South Dakota. Maxine Case owns 1,200 shares with 400 of the shares co-owned with her son, Gary Case. Judith Sides, Gary's ex-wife, owns 400 shares. Jean McColloch and her daughter, Sandra McCroden, co-own 400 shares. Maxine Case and McColloch are sisters. Craig and Nancy Murdock (Murdock) co-own 400 shares and are not related to the other parties.
[Â¶3] The parties have a long history of conflict and litigation. Two previous appeals have been heard by this court, Case v. Murdock, 488 NW2d 885 (SD 1992) and Case v. Murdock, 528 NW2d 386 (SD 1995). Two factions have developed: the Case faction consisting of Maxine Case, Gary Case, and Sides and the McCroden faction consisting of McCroden, McColloch, and Murdock.
[Â¶4] The articles of incorporation of Hickok's, Inc. contain a preemptive rights provision which requires any shareholder wishing to sell his or her shares to first offer the shares to the corporation. In the event the corporation declines to purchase the shares, the current shareholders are given a preference in the purchase of the shares.
[Â¶5] On February 27, 1996, Maxine Case, Gary Case, and Sides met and discussed the sale of one faction's shares to the other as a solution to problems within the corporation. They agreed upon a price of $668.75 a share, with a 30% downpayment and the balance paid over 10 years at 8% interest. The security was left for later determination. Attorney Robert LaFleur was present at the meeting and represented Maxine and Gary Case. It was suggested that Sides retain separate counsel to represent her in the potential sale. Sides retained attorney Jerry Johnson.
[Â¶6] In the absence of the corporation's attorney, Joe Butler, another attorney in his firm, Patrick Duffy, attended the meeting. He relayed the information by letter on March 4, 1996 to Richard Pluimer, attorney for the McCroden faction. The letter stated:


Judy and Maxine have requested that I inform you of an offer they are willing to make to either buy or sell their shares. These parties will either buy or sell at a price of $668.75 per share, with 30 percent down, the balance over 10 years at 8 percent. Of course, the sellers would need some security, and we will work that out at some future date, whoever decides to buy or sell. All lawsuits would be dismissed and all parties would be dismissed as well. This may be the best way for all sides to settle their differences. Let me know what you want to do. I am just the middle man, but I'll be glad to be the conduit for offers or negotiations.


The next board meeting will be on March 15. At the outset of that meeting, this offer will expire. Should the offer not be taken up by either side, then I have been instructed to explore the idea of a "shadow board" which would review the lawsuits presently pending, and make a decision as to what position the board ought to take. I anticipate that the "shadow board" will be a topic of discussion at the next board meeting.
[Â¶7] The March 15 meeting was rescheduled to March 22. In a letter to Pluimer dated March 12, Duffy stated: "I am also told that the offer by the 'Case faction' is intended to remain open until the start of the meeting on the 22nd." The letter indicates that Maxine Case and LaFleur received a copy of the letter.
[Â¶8] On March 22, the parties met for the annual meeting. Due to a disagreement, the meeting ended after a few minutes. It was rescheduled to April 9.(fn1) 
[Â¶9] McColloch claims that the offer to buy or sell was extended at the March 22 meeting to the April 9 meeting. Part of the March 22 meeting was audio taped.
[Â¶10] Pluimer sent a letter to Butler and LaFleur on April 5 conveying McColloch's decision to purchase Maxine Case, Gary Case, and Sides' shares. He included $5,000 earnest money and a stock purchase agreement which paralleled the terms of Duffy's letter. The purchase agreement provided for the shares to remain as security for the unpaid balance of the purchase price. A closing date of April 15 was proposed.
[Â¶11] The check for $5,000 earnest money was not cashed. Instead, LaFleur notified Pluimer on April 15, 1996 that the offer had expired because it had not been timely accepted.
[Â¶12] McColloch, McCroden, and Murdock then initiated discussions with Sides to purchase her shares. Eventually the discussions resulted in a "loan" agreement. The parties signed the initial agreement on April 18. A revised agreement and a release discharging Sides from existing or future claims made in connection with the corporation were signed in August.
[Â¶13] Maxine Case filed a complaint against McColloch and Sides on May 6, 1996 claiming that the loan agreement was actually a sale of Sides' shares in violation of the articles of incorporation. McColloch filed a counterclaim against Maxine Case, Gary Case, and Sides claiming that they breached an agreement to sell their shares. She sought specific performance of the agreement. McCroden and Murdock intervened as plaintiffs on the counterclaim.
[Â¶14] The trial court found that 1) the loan agreement was not a disguised sale and did not violate the articles of incorporation and 2) the parties had not entered into an agreement to sell shares. This is a consolidated appeal of both issues.
STANDARD OF REVIEW 
[Â¶15] We review the trial court's findings of fact under a clearly erroneous standard. Fanning v. Iversen, 535 NW2d 770, 773 (SD 1995) (citations omitted). Conclusions of law are reviewed de novo. Id. (citations omitted). "The effects and terms of a contract are questions of law to be resolved by the court. On appeal, this court can read a contract itself without a presumption in favor of the trial court's determination." Baker v. Wilburn, 456 NW2d 304, 306 (SD 1990) (citations omitted).
[Â¶16] 1. Whether The McColloch-Sides Agreement Was A Sale Of Shares In Violation Of The Preemptive Rights Provision Of The Articles Of Incorporation.
[Â¶17] Maxine Case claims that a sale of stock by one shareholder to another shareholder without first offering the stock to the corporation and the other shareholders violates the articles of incorporation of Hickok's, Inc. Article VI of the articles of incorporation grants preemptive rights to the shareholders. It states:
PREEMPTIVE RIGHTS 


The following provisions are adopted, creating preemptive rights to acquire additional shares and restricting transfer of common stock.


Any further offering of common stock in the corporation from and after the initial issues of common stock to the incorporators and subscribers shall first be offered at par pro rata to the common stockholders in relation to their then present holdings and the common stockholders shall be given a reasonable time within which to purchase said additional shares. Any shares not so purchased by the common stockholders may then be purchased by any other person.


In the event a stockholder desires to sell his shares of stock, he must first offer them for sale to the corporation, stating the terms of sale and unless his terms are accepted by the corporation within thirty (30) days thereafter, the right of the corporation shall be deemed to have been waived. At the same time as the notice to the corporation, the selling stockholder shall give notice to the other holders of common stock, setting forth the terms of his offer to sell, it being the intention to give the present stockholders a preference in the purchase of such shares in the event the corporation shall not redeem same. Said notice and offer shall state the terms of sale and unless the terms are accepted within thirty (30) days by the corporation or within forty (40) days from the date of said notice by one or all of the other stockholders, the stockholder and corporate preferences set forth herein shall be deemed to be waived and the selling stockholder shall be at liberty to sell to any person or corporation.
Maxine Case argues that the agreement between McColloch and Sides was actually a sale of Sides' shares, rather than a loan with a pledge of her shares as security. Therefore, she claims that the transaction violated the articles of incorporation. We agree.
[Â¶18] The parties do not cite any South Dakota law on this issue. Our research produced no authority directly on point. However, Fletcher Cyclopedia on the Law of Private Corporations states:


The difference between a pledge and a mortgage at common law is that in the pledge the possession only is transferred, while in the sale the title is transferred, either with or without possession.


...
Whether a particular transaction is a pledge or a sale is ... a question of construction, and depends upon the intention of the parties ... . This intention may be shown either by other writings or by parol evidence.
Fletcher Cyc Corp Â§5639 (Perm Ed) (footnotes omitted). Therefore, we must consider the intent of the parties when they entered into the agreement.
[Â¶19] Discussions regarding Sides' shares began after McColloch learned on April 15 that Maxine Case and Gary Case claimed the March 4 offer had not been timely accepted.(fn2)  On April 17, McColloch's attorney sent Sides' attorney a letter proposing terms for a loan. The letter referred to McColloch's continued desire to purchase Maxine and Gary Case's shares. It stated:


It would be my clients' intention to continue to keep open discussions with Maxine and Gary for the purchase of any stock or interest in potential stock which they may have, and I believe an arrangement similar to what we are proposing here could facilitate that conclusion much more quickly.
[Â¶20] On April 18, Sides accepted the offer subject to additional provisions detailed in a letter written by her attorney. The subject matter of the letter was identified as "Sale of Stock by Judith Sides in Hickok's Inc." Sides, Pluimer, McCroden, McColloch, and Murdock signed the letter accepting the additional terms proposed by Sides. Based on a review of the record, it appears that the March 17 and March 18 letters constituted their agreement until the parties executed a revised agreement on August 8, 1996.(fn3)  The revised agreement was executed after Maxine Case filed her complaint. McColloch claims that the need for a revised agreement was anticipated when the parties entered into the initial agreement because the parties were acting quickly in order to complete the transaction before the April 18 meeting.
[Â¶21] Under the terms of the agreement, McColloch provided Sides with an interest-free, non-recourse loan in the amount of $314,802.92.(fn4)  Sides received $80,000 on April 18, with the balance to be paid in five annual payments of $46,960.59 beginning on August 1, 1997. Sides pledged her 400 shares as security for the loan and executed an irrevocable proxy to McColloch authorizing her to vote the shares for all corporate purposes. At the end of the five year period, the loan becomes due and payable.
[Â¶22] As to dividends received from the shares, the agreement provides:


If dividends or corporate funds attributable to the shares of stock made the subject of this Agreement are paid to Borrower while this Agreement is in force, the Borrower shall deduct from those dividends or corporate funds the amount of income tax liability that has been paid or that is required to be paid by Borrower with respect to that sum or amount of money and then shall pay the remaining balance to Lenders who shall credit such sums against the loan balance. If the loan balance has been repaid, the Borrower may retain any and all such dividends.
The March 17 letter stated that "[a]ny future dividends attributable to these shares would become the property of my clients [McColloch]."
[Â¶23] If McColloch fails to timely furnish the loan proceeds to Sides, McColloch has thirty days after receiving written notice to cure the default. If she does not, then she forfeits all rights to repayment of the loan and the shares are returned to Sides.(fn5)  However, McColloch's sole recourse if Sides fails to repay the loan is foreclosure on the shares. The agreement states: "It being the intent of the parties that the Borrower shall under no circumstances have any personal liability or responsibility as a result of a default other than loss of her shares of stock."
[Â¶24] The agreement acknowledges the possibility that the transaction might be interpreted as a sale, rather than a loan. It states:


In the event the transaction made the subject of this agreement is deemed by a court or any fact finder not to constitute a valid loan but is in effect a sale of Borrower's shares of stock subject to the preemptive rights of Hickok's Inc., or its shareholders as set out in the Articles of Incorporation of that corporation, then Lenders will immediately offer to purchase those shares of stock from Borrower for Two Hundred Sixty-seven Thousand dollars ($267,000). Any monies that have been advanced at that time to Borrower under this Agreement shall constitute a down payment under that offer which, if accepted by Borrower, shall be credited against the principal amount of $267,000, with the balance to be paid in consecutive monthly installments of principal and interest over a five (5) year period at an interest rate of eight (8) percent. In the event that Hickok's, Inc., or any of its shareholders elect to match that offer, Borrower will repay the balance then owed to Lenders under this Loan Agreement within thirty (30) days of execution of the stock purchase documents.
Sides' attorney also recognized the possibility that the transaction would be considered a sale of her shares. In a letter to Sides dated April 18, 1996, he stated, in part:


As you know, you and I tried to sit down and consider every angle in order to offer you maximum protection from past or future suits and still allow you to extricate yourself from Hickok's, Inc. As I indicated to you, however, there are no guarantees that I can give to you in that regard. Again, one of the risks is that Maxine and Gary Case will decide to attack the loan agreement by arguing that it constitutes a sale. If a court were to agree, the court could go on to hold that the corporation as well as all shareholders are entitled to 30 days notice to give them an opportunity to exercise their preemptive rights.
[Â¶25] A review of all the documents for the intent of the parties reveals that the transaction between McColloch and Sides was a sale of Sides' shares. In the March 4 letter, Sides expressed her interest in selling her shares.(fn6)  McColloch, McCroden, and Murdock wanted control of Sides' shares by April 18 in order to vote them at the meeting scheduled for that date.(fn7)  The agreement provided for an interest-free loan in the amount of $314,802.92. McColloch's only recourse if Sides' fails to repay the loan is to take the shares. However, if McColloch defaults in payment of the loan to Sides, then McColloch forfeits her rights to repayment from Sides and the shares are returned to Sides. We must look beyond the form of the agreement to the substance. Under this arrangement, McColloch has sole control over title of the shares for at least the five year period of the loan. Calling it a loan does not make it so; nor does it alter the true nature of the transaction, which was a sale of Sides' shares.
[Â¶26] We need not address whether a pledge of shares as security for a loan would violate the preemptive rights provision because, for all of the above reasons, we find the transaction between McColloch and Sides to be a sale. Therefore, we reverse the trial court because the sale of Sides' shares was in violation of the articles of incorporation.
[Â¶27] 2. Whether An Offer To Sell Shares Was Made And Timely Accepted.
[Â¶28] McColloch, McCroden, and Murdock claim that Maxine Case, Gary Case, and Sides made an offer to sell their shares in the March 4 letter. They claim that they accepted the offer on April 5 before it expired and, therefore, Maxine and Gary Case breached the contract when they refused to sell.
[Â¶29] Initially, we note that the March 4 letter sent by Duffy referred only to Maxine Case and Sides and did not mention Gary Case as an offeror.(fn8)  The letter stated: "All lawsuits would be dismissed and all parties would be dismissed as well." This could not be accomplished without the involvement of Gary Case.
[Â¶30] However, we need not address whether the terms expressed in the letter dated March 4 were sufficiently definite and complete so as to be considered an offer because we find that the offer, if it was an offer, had expired prior to any attempt at acceptance. The letter from Duffy dated March 4 stated that the "offer" would expire "[a]t the outset" of the March 15 board meeting. The meeting was rescheduled to March 22 and the "offer" was "to remain open until the start of the meeting on the 22nd." 
[Â¶31] McColloch, McCroden, and Murdock claim that the offer was again extended at the March 22 meeting. They claim it was to remain open until the next board meeting scheduled for April 9. According to the transcript of the audio tape made at the March 22 meeting, Butler, attorney for Hickok's, stated:


As I understand it, Bob [LaFleur,] tells me they want to proceed with the annual meeting. They are willing to extend the time within which you have the right to consider the offer that's been made.
However, Butler testified at the court trial that he understood that the offer was only open until the end of the March 22 meeting.(fn9)  The trial court found that even if a valid offer had been made, the offer was not accepted within the time limits specified. McColloch, McCroden, and Murdock have not shown that the trial court's finding of fact is clearly erroneous. Therefore, we affirm the holding that the parties did not enter into an agreement to sell their shares because the offer, if any, expired before it was timely accepted.
[Â¶32] We reverse 1) and affirm 2).
[Â¶33] MILLER, Chief Justice, and AMUNDSON, KONENKAMP and GILBERTSON, Justices, concur.
Footnotes
1.  The annual meeting was later continued until April 18. 
2.  Sides' shares were included in the March 4 offer. 
3.  The March 18 letter incorporates the terms of the April 17 letter from McColloch's attorney. It states:


I have reviewed your letter of April 17, 1996, and the offer contained therein with my client. The terms set out in that letter are accepted subject to any changes as well as any additional terms that follow. 
4.  During the court trial, Sides testified about the manner in which the amount of $314,802.92 was calculated:


Q: [I]f I recall correctly, the March 4th letter, it had offered to buy or sell shares at $668.75 per share, and it required a certain sum down, I think 30 percent, and the balance payable at 8 percent interest for up to ten years; is that correct?
A: That's correct.
Q: Is that correct? And so this number of $314,802.92 was reached by determining how much you would receive for your shares at that purchase price, plus 8 percent interest over a five-year period?
A: Correct.
Q: And to the best of your knowledge, that number is, if not exact, it's within pennies of being the same amount?
A: Yes. 
5.  The agreement states:


Should there be a default by the Lenders in the timely furnishing of any loan proceeds on August 1st of each year as called for under this Agreement, this Agreement will be in default and should the default not be cured within thirty (30) days of written notice of the default to the Lenders by the Borrower, the Lenders shall forfeit all of their right to repayment of any proceeds loaned to the Borrower and the escrow agent shall deliver the pledged stock to Borrower. However, any such default shall not affect the term, validity, or effect of the proxy referred to in Section 5 which was given or executed in a transaction separate and distinct from this loan agreement.
...
It is also agreed that Lenders will not be entitled to receive any dividends from the stock made the subject of this Agreement in the event that they are in default by having failed to advance loan proceeds as required under this Agreement. 
6.  Sides testified at the court trial regarding her intent when she hired Johnson to represent her:


Q: So you went to see Mr. Johnson. Can you describe for me what, if any, goals, targets or desires you set out to Mr. Johnson, that is, what you wanted to accomplish or you wanted him to accomplish for you?
A: I just expressed to him my situation, which I thought was kind of a precarious situation, and that there was an offer that had been made, and I didn't know if I was buying or I was selling, but I felt something was going to be happening within that month and I needed counsel for.
Q: Okay. You indicated your situation was precarious. What did you mean by that? How did you view it to be precarious?
A: Well, as I think in some of the testimony, I'm kind of like a man without a country. I have no real ties with this group any longer.
...
Q: Now, what--is it a fair statement that you wanted to get out of the line of fire, you wanted to be out of the battle, out of the fighting?
A: I'm not a fighter by nature, and I did not and I could not see much good coming from the battles that are--that were being waged with this group of people.
Q: You felt that one way for it to end would be if one faction or the other and--if one faction, regardless of which, bought out the other?
A: I think that's been very obvious since the very beginning of our battle. I think attorneys have told us that from day one. 
7.  Sides testified at the court trial regarding the use of her proxy at the April 18 meeting:
Q: My question is, you executed it [the proxy] on April 18th, 1996?
A: It was signed on that day, yes.
Q: And it was in fact used on that day?
A: Yes, it was.
Q: Okay. So it was not only executed, it was put to use?
A: I'm assuming it was, yeah. I mean, I wasn't there.
Q: You did not attend the meeting?
A: No.
Q: You understood it was their intent to put it to use?
A: Yes.
Q: And there was to be an election of directors that day?
A: Yes.
Q: And your 400 shares were considered an important part of that, the voting power of your 400 shares?
A: Yes. 
8.  The evidence shows that Gary Case's name was included in the initial draft of the letter, but was not included in the final. 
9.  Butler testified about the events on March 22:
Q: Okay. At the conclusion of your meeting upstairs, was there--what was your understanding insofar as any extension of the offer past that meeting?
A: You mean the meeting in my office?
Q: Past the meeting that was to conclude downstairs.
A: It was my understanding that the offer was to be open during the meeting downstairs and at the end of that meeting it was done.
...
Q: Now, the second sentence of Exhibit 38 [the transcript of the audio tape made March 22], where it says-- and this is attributed to you-- "They are willing to extend the time within which you have the right to consider the offer that's been made.
A: Mm-Hmm.
Q: Did you-- what offer did you understand that to mean?
A: It was the offer that Mr. Duffy had and that ... Bob [LaFleur] and Pluimer had discussed in my office.
Q: And by "willing to extend the time," what time extension did you understand that to mean?
A: During the meeting[.]
Q: And you had already indicated to Mr. Pluimer and Mr. LaFleur, the meeting upstairs, that the extension would only last through the meeting, or you were advised of that?
A: I didn't make the extension, Becky. Bob [LaFleur] made the extension, I heard him say it in my office. I had no authority to make any extension. I wasn't representing Maxine [Case] or Judi [Sides].
...
Q: Now, at the conclusion of this meeting, or at least the conclusion of the transcript ... what did you understand the status of Mr. Duffy's proposal of March 4 to be?
A: It was down the drain[.]
Q: Do you recall anything said by anyone as to allowing an additional week to ten day extension after that meeting to consider this?
[Objections omitted].
A: No, no, I didn't hear that[.]